IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CARL STRYCZNY, JR., | ) | CASE NO.  1:07CV1278 |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE HEMANN |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | MEMORANDUM OPINION |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the magistrate judge pursuant on consent.  The issue before the court is whether the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for disability benefits under Title II of the Social Security Act, 42 U.S.C. § 416(i) and 423 *et seq.*, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the decision of the Commissioner is affirmed.

I.

Plaintiff, Carl Stryczny ("Stryczny"), filed an application for disability benefits in October 2004, alleging an onset date of June 1, 2002.  Plaintiff asserted disability due to seizures.

After plaintiff's application for disability was denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Plaintiff was represented by counsel and testified on his own behalf. A medical expert and vocational expert also testified.

On December 22, 2006 the ALJ issued a finding of no disability. The ALJ found that plaintiff has severe impairments of borderline intellectual functioning, epilepsy, personality disorder, and alcohol dependence but concluded that he does not have an impairment or combination of impairments equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (1992). The ALJ further concluded that plaintiff retains the residual functional capacity to perform a significant range of work but is limited in the following ways: simple, repetitive work; low stress work that doe not involve confrontation, arbitration, negotiation, or responsibility for the safety and welfare of others; minimal interaction with the public, co-workers, and supervisor; no complex reading or math and only rudimentary math or reading at the fourth grade level; no heights or climbing ladders, ropes, or scaffolds; no hazards or moving machinery; and no driving vocationally.

The ALJ concluded that plaintiff could not perform any past relevant work. Based on the testimony of the vocational expert, the ALJ determined that there existed in the national economy a number of jobs plaintiff can perform, including assembler, final assembler, and inspector. Thus, he concluded, plaintiff is not disabled.

Plaintiff requested review by the Appeals Council. The Appeals Council refused to review the determination, and the ALJ's finding became that of the Commissioner. On appeal plaintiff raises a single issue: the ALJ erred in finding that plaintiff's impairments do not meet or equal listing 12.05C.

2

II.

Stryczny was 36 years old at the time of the ALJ's decision. He dropped out of the ninth grade at the age of 19 when repeating it for the fourth time.[1] He was placed in learning disability classes through school. Plaintiff has past relevant work as a landscaper, busboy, maintenance worker, roofer, and warehouse worker. Stryczny testified[2] that he had not been drinking alcohol for a year. He was on an increased dosage of Dilantin, a dosage that had been prescribed when he was incarcerated. Plaintiff testified to having had four or five seizures when in prison. He also described his work in a sugar company as a machine operator and walking supervisor. As a supervisor he made sure that the people on his line were doing their jobs right, i.e. packing and putting the correct codes on the boxes. He maintains he was fired from the job due to repeated seizures.

The medical evidence of record is as follows. Between 2002 and 2004 plaintiff suffered at least nine seizures and was seen in the emergency room. Each time it was clear that plaintiff had been drinking and/or was noncompliant with his seizure medication. Despite defendant's assertion, there is no evidence of a causal relationship between plaintiff's seizures and his alcohol abuse. Diagnoses consistently list seizures, non-compliance with medication, separate from alcohol abuse.

Plaintiff was treated by Karim Lopez, M.D. Dr. Lopez noted in October 2001 that

---

[1] There are discrepancies throughout the record whith respect to when plaintiff dropped out of high school.

[2] The record indicates very little questioning of plaintiff by the ALJ or counsel. Much of the hearing was taken up with legal argument.

plaintiff was drinking less and taking his Dilantin. His seizures had improved. He was to return to work in three weeks. Dr. Lopez noted later in the month that plaintiff had been fired from his job because he did not return on the date he was scheduled to. In April 2004 Dr. Lopez saw plaintiff for a check up. Plaintiff wanted to go to work and needed a release statement saying that he was able to do so. Plaintiff had been off of Dilantin for a few weeks. He reported that his last bad grand mal seizure was in October 2003. He had a soft tissue mass on his right forehead.[3] Plaintiff felt well and had no complaints at that time. The diagnosis was seizure disorder, soft tissue mass right forehead, and probable alcohol abuse. He was released to work on the restriction that he stay on his medication, not operate heavy machinery or drive, and not do any heights. Dr. Lopez offered removal of the soft tissue mass but plaintiff was undecided about removal at that time. In November 2004 Dr. Lopez completed a form for the state agency. His diagnosis was post-head injury seizures, noncompliance, and alcohol abuse.

In November 2004 plaintiff was examined by Herschel Pickholtz, Ph.D. for the state agency. Stryczny stated that he could not work because of a history of seizures, both petit and grand mal ones. He had worked for a temporary agency in autumn or spring but could not remember other past work. He had stopped drinking three weeks before. His daily activities consisted of watching the news, making his breakfast, helping with chores, doing the dishes, cleaning the kitchen, watching television, trying to help his children with homework, weeding, reading the Bible once in a while, going to AA meetings on weekends, playing cards, and going to church. Plaintiff stated he dropped out of school in the 11th grade and was in LD classes except for math where he was in regular

---

[3] Plaintiff had a "bump" on his head at the time of the hearing which counsel suggested was the result of a recent fall during a seizure. That is likely not the case.

classes. He had a bump on his forehead. Dr. Pickholtz stated that plaintiff's overall intellectual functioning was at the upper end of the mild mentally retarded ranges of functioning. His affect was a bit constricted and his mood a little lethargic and slow. He reported that his hands trembled when he was anxious. Plaintiff's ability to recall long-term history fell within the mild mentally retarded range, as did his ability to recall five objects after 20 minutes. His short-term and immediate recall ranged between the borderline to the mild mentally retarded ranges of function and overall levels of reading recognition were at a 4th grade level. Plaintiff obtained a full-scale IQ of 66. Dr. Pickholtz found that score to be inconsistent with plaintiff's placement in LD classes and felt it might be an indication of deterioration associated with his seizures. Dr. Pickholtz diagnosed mild cognitive dementia and mild amnestic disorder which "premorbidly" fell at least within the borderline levels of functioning; long history of alcohol dependency; mixed polysubstance abuse allegedly in remission as of years ago; mixed personality disorder involving addictive, narcissistic and passive/aggressive features; and learning disorder, not specified. He assigned a GAF of 60-65. As for adaptive skills, Dr. Pickholtz placed plaintiff in the mild and the mild to moderate ranges of impairment.

Plaintiff was incarcerated from August 2005-March 2006. Plaintiff reported a seizure in September 2005 and two seizures in November 2005; otherwise his seizures appear to have been controlled by regular use of medication.

In October 2006 plaintiff saw Samuel Detwiler, D.O. Plaintiff was depressed and had experienced a seizure. Dr. Detwiler's diagnosis was epilepsy, unspecific, without intractable epilepsy, and mild mental retardation.

Melvin Ross, M.D. testified at the hearing as a medical advisor. Dr. Ross noted that

plaintiff had been non-compliant with his medications and with abstinence from alcohol. He testified that plaintiff's IQ scores fell within the mild mental retardation category and that there was no evidence the IQ scores were invalid. He further testified that a person could be mildly mentally retarded and yet have a GAF of 60. He identified alcoholism as plaintiff's only other significant impairment and opined that plaintiff fell in the borderline intellectual functioning range. He based the latter opinion on Dr. Ross's note that plaintiff was in LD classes and Dr. Ross's evaluation of plaintiff's various areas of adaptive behavior. Finally Dr. Ross testified that there was no evidence of a causal relationship between plaintiff's drinking and his seizure disorder and that plaintiff's impairments did not meet or equal any listing.

Plaintiff's counsel argued as follows at the hearing:

> Well, what I'm suggesting to you is Pickholtz is saying that he [plaintiff] probably was functioning at borderline, but since his seizure disorder was at multiple seizures, and probably along with his alcohol abuse, his functioning has gone significantly downward. And, at this time, he's functioning at MMR. That's why I'm saying there's an equal. It's not because he, he was diagnosed with MMR prior to age 21, but that now he is, so his impairment is equally as severe as somebody that was diagnosed beforehand.

### III.

A claimant is entitled to receive supplemental security benefits under the Social Security Act when he establishes disability within the meaning of the Act. 42 U.S.C. §1382c(a)(1); 20 C.F.R. §416.905 (1992); *Kirk v. Secretary of Health and Human Servs.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §416.905 (1992).

This court's review is limited to a determination of whether on the record as a whole

the Commissioner's decision is supported by substantial evidence. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978). "Substantial evidence" is more than a scintilla of evidence but less than a preponderance of evidence. It is evidence which a reasonable person would accept as adequate support for a proposition. *Richardson v. Perales*, 402 U.S. 389 (1971). If the decision is supported by substantial evidence, the Commissioner's determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

Plaintiff's sole argument here is that due to his seizures and alcoholism he suffers from mild mental retardation and, therefore, coupling that conclusion with his severe seizure impairment, his impairments equal listing 12.05C. The relevant portion of 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.00 reads as follows:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing. . . . For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, *i.e.*, is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work.

"Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period . . . ." Section 12.05.

This court has long held that listing 12.05C does not require a finding of mental

7

retardation.  Nor can the court look to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) for diagnostic criteria for mental retardation. In reviewing a suggestion that the Agency use the definition of mental retardation ("MR") found in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), the Agency responded as follows:

> We did not adopt the comment.  The definition of MR we use in our listings is consistent with, if not identical to, the definitions of MR used by the leading professional organizations.  The four major professional organizations in the United States that deal with MR have each established their own definition of MR.  While all the definitions require significant deficits in intellectual functions, as evidenced by IQ scores of approximately 70 or below, age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations.
>
> *****
>
> The definition of MR used by SSA in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over another.  While capturing the essence of the definitions used by the professional organizations, it also is used to determine eligibility for disability benefits.  SSA's definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations.

67 Fed. Reg. 20018, 20022 (April 24, 2002).

The court recognizes, however, that a diagnosis of "mental retardation," as referenced in 12.05, requires a showing of three distinct criteria: 1) significantly subaverage general intellectual functioning, 2) with deficits in adaptive functioning, 3) manifesting before the age of 22.  Thus a showing of subaverage general intellectual functioning alone before age 22 is not sufficient.  This conclusion finds support in the Agency's regulations.  While the Agency has not adopted the standard of any specific professional organization for determining whether an individual has deficits in adaptive functioning, it is clear from the plain language of 12.05 and the discussion in the Federal Register that an ALJ must consider not only the claimant's IQ scores but also the claimant's

adaptive functioning.

Here plaintiff's counsel admitted at the hearing that plaintiff did not meet the IQ requirement before age 22. His schooling and his work history belie an IQ below 70. Moreover, as defendant points out, there is no evidence that plaintiff demonstrated deficits in adaptive functioning prior to age 22. Once again, his work history shows the opposite. His warehouse position alone shows that he was able to work cooperatively with co-workers and act in a supervisory role.

Plaintiff argues that his current impairments equal, not meet, listing 12.05C. To equal the requirements of medical equivalence plaintiff must show that he had "findings related to [his] impairment that are at least of equal medical significance to the required criteria." Plaintiff argues in a conclusory fashion that his mental impairments are currently within the mild mentally retarded category. That is not what Dr. Pickholtz or Dr. Ross stated. Dr. Pickholtz found plaintiff's overall functioning to be within the borderline intelligence category because of his work history; in short he found that plaintiff tested lower than he was capable of performing. Dr. Ross agreed with Dr. Pickholtz.

The court concludes that the ALJ's decision is supported by substantial evidence. One only need look to plaintiff's reported activities of daily living to confirm that conclusion. He watched the news, made his breakfast, helped with chores, did the dishes, cleaned the kitchen, watched television, tried to help his children with homework, weeded, read the Bible once in a while, went to AA meetings on weekends, played cards, and went to church. There is no evidence in the record that these activities are consistent with one who is mildly mentally retarded. Plaintiff has not shown that his current impairments are "at least of equal medical significance to the required

9

criteria."

IV.

The court feels constrained to add a comment and plea as my retirement draws near. For almost 15 years this court has preached civility to counsel and parties. For almost the same amount of time the court has commented on the incivility of Administrate Law Judges during the hearings. It appears that civility and respect are irrelevant to the Commissioner, and it appears that those individuals who represent the Commissioner in these cases are unwilling to address the issue. The comments of ALJ Morley White in this case are an example of incivility and condescension. Unprovoked, he stated to counsel, "Counsel, I can tell you you're not going to get a decision today. Just giving you a fair warning on that." Later he states, again with no indication that plaintiff's counsel sought an immediate decision, "Let me, I told you earlier I'm not going to make a decision today. You, you're not going to get it. You know, stand up, whistle Dixie, do whatever you want, you're not getting it. So you know, that's the foregone conclusion." The ALJ questioned the math of the vocational expert at one point, saying, "Either your math sucks or I'm misreading." Why the unprovoked comments to plaintiff's counsel about getting an immediate decision? Why the use of language that doesn't belong in any civil discourse? Why is there an inability to project to both counsel and the claimant the dignity appropriate for a judicial officer and the respect to which all claimants and counsel are entitled? And why doesn't anyone involved with this system care?

For the above stated reasons, the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

Dated: January 14, 2008                              s:\Patricia A. Hemann
                                                                    Patricia A. Hemann
                                                                    United States Magistrate Judge